# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

LEON EGGLESTON,

      Plaintiff,

vs.                                             CIVIL NO. 03-238 LFG/RLP

INTERLINK COMMUNICATIONS
PARTNERS, LLC,
dba Charter Communications,
aka Charter Communications, Inc.,
aka Charter Communications VI, LLC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's Summary Judgment Motion [Doc. 23]. The Court considered the motion, Plaintiff's response in opposition [Doc. 25] and Interlink's reply [Doc. 26]. Oral argument is not necessary. This matter may be resolved based on the parties' submissions.

### Background

Plaintiff Leon Eggleston ("Eggleston") was hired by Defendant Interlink Communications Partner, LLC ("hereinafter "Charter Communications" or "Charter") on September 13, 1999, when Charter acquired Eggleston's former employer, Rifkin & Associates, Inc. Eggleston was Charter's Office Operations Manager and was responsible for managing the customer service and office administration functions for Charter's Ruidoso, New Mexico operations. Charter also maintained an office in Alamogordo, New Mexico.

Eggleston contends that many of his male co-employees made derogatory and vicious comments about Eggleston's sexual orientation, implying that he was a homosexual. The comments reported by Eggleston are all mean spirited, boorish and totally inappropriate. Eggleston did not allege that any of the comments were made by Charter's directors, managers or supervisors or that Charter's management in any way condoned or encouraged the employee misconduct.

Eggleston brings claims of retaliation in violation of the New Mexico Human Rights Act and wrongful or retaliatory discharge in violation of New Mexico public policy that encourages employees to organize collectively.[1] [Doc. 1, Ex. A, Complaint.] Initially, it was unclear whether Eggleston was also asserting that the alleged sexual orientation discrimination formed the basis of a separate claim, but his response brief clarified that "Plaintiff is not making an independent claim of sexual harassment in this action." [Doc. 25, p. 9]. Instead, he contends that he had a good-faith subjective belief that he was being sexually harassed which forms the basis of his retaliation claim. Specifically, he contends that women in his office were not subjected to similar harassment. As a result of his purported good-faith complaints of discrimination, Eggleston contends that Charter retaliated against him by terminating his employment in Ruidoso and by offering him a severance package that was different than the severance package proposed to employees who had not complained of discrimination.

Eggleston also asserts that he was wrongfully discharged after he informed management in a letter dated January 11, 2001 of the alleged unfair treatment of its employees in Ruidoso and his belief that unionization was inevitable. [Doc. 25, p. 11.] He contends that Defendant's actions in

---

[1] In his response, Eggleston stated that he is not pursuing a claim of age discrimination. [Doc. 25, p. 10.]

2

terminating him violated public policies of the State of New Mexico, including policies that encourage employees to organize collectively.

## Analysis

**I.     RETALIATION**

As Eggleston does not contend that he was discriminated against because of his sexual orientation, the Court deals only with the retaliation claim as brought under the New Mexico Human Rights Act. Plaintiff's burden of establishing a *prima facie case* of retaliation under § 28-1-7 NMSA, is actually identical to his burden under Title VII. Gioia v. Pinkerton's Inc., 194 F. Supp. 2d 1207, 1220 (D.N.M. 2002) (*relying on* Cates v. Regents of the New Mexico Institute of Mining & Technology, 124 N.M. 633 (N.M.1998)).

To make a *prima facie* showing of retaliation, a plaintiff must show that: (1) he engaged in protected conduct; (2) his employer took an adverse action against him contemporaneously or subsequent to the protected activity; and (3) there exists a causal connection between the adverse employment action and the protected activity. Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1213 (10th Cir. 2003); Pastran v. K-Mart Corp., 210 F.3d 1201, 1205 (10th Cir. 2000). Plaintiff bears the burden of establishing his *prima facie* case of retaliation. Assuming he succeeds, the burden of production shifts, and the defendant must articulate a legitimate, non-discriminatory reason for the adverse action. Purrington v. Univ. of Utah, 996 F.2d 1025, 1033 (10th Cir. 1993), *abrogated on other grounds,* 316 F.3d 1137 (10th Cir. 2003). If the defendant satisfies its burden, the burden returns to Plaintiff to show that the asserted reason was pretextual. Pastran, 210 F.3d at 1206.

3

### A. *Prima Facie Case of Retaliation*

The evidence that Eggleston provides in support of a *prima facie* showing of retaliation is weak at best. With respect to the "protected activity" prong, Eggleston states that on January 22, 2001, he reported to his supervisor Paul Crown offensive or harassing insults made by other employees about Eggleston's mannerisms, the inference that he was gay and comments about Eggleston's wife. [Eggleston Dep. at 58-63.] On that same date, Eggleston told Crown of rude comments made by employees about other employees, and he raised concerns with Crown about Eggleston's views that the business might be unionized. He believed that he was blamed by Crown for union packets being delivered, which he denied doing. [Id. at 80, 150-51.] Previously, on January 11, 2001, Eggleston wrote a letter to Patrick Martinez, Charter's Human Resources Manager. In that letter, Eggleston discussed his concerns about morale and practices in the Ruidoso office, salary discrepancies, and Eggleston's view that unionization was inevitable. [Doc. No. 24, Martinez Aff., Eggleston letter attached.]

Nothing in the January 11 letter refers to any alleged sexual harassment being directed against Eggleston, or that he was being discriminated against for any reason. While the letter does refer to complaints made by female customer service representatives ("CSRs") concerning salary, his belief that they might file a class action, and the potential for union activities, nothing in the letter indicates that Eggleston, himself, is complaining about sexual discrimination for CSRs or discrimination against him because of his comment that unionization is inevitable. To the contrary, the thrust of his letter is that his own salary is inadequate and that his supervisor lacks trust in him.

The Court will accept, without specifically finding, that Eggleston's allegations of union activity, complaints to Crown regarding CSR's, and complaints to Crown about inappropriate rude

4

comments in the workplace constitute protected activity sufficient to satisfy the first prong of his *prima facie* retaliation claim, although the evidence is weak. Eggleston satisfies the second prong of the test because Charter's termination of Eggleston's position as Office Operations Manager in Ruidoso in May 2001 is sufficient to show an adverse action was taken. Conduct is retaliatory if it "alters the employee's 'compensation, terms, conditions or privileges of employment' or 'adversely affect[s] his . . . status as an employee.'" Sanchez v. Denver Pub. Schs., 164 F.3d 527, 533 (10th Cir. 1998) (internal quotation omitted).

Eggleston must next satisfy the third element of his *prima facie* case with respect to establishing a causal connection between his protected activities and Charter's adverse employment action. "A causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001) (*quoting* Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.), *cert. denied* 459 U.S. 1071 (1982)).

When the plaintiff relies solely on temporal proximity to establish the causal connection prong, such proximity must be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273, *reh'g denied*, 533 U.S. 912 (2001); O'Neal, 237 F.3d at 1253. "The Tenth Circuit has held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation but that a three-month period, standing alone, is insufficient." Martinez v. Henderson, 252 F. Supp. 2d 1226, 1239 (D.N.M. 2002) (*relying on* O'Neal, 237 F.3d at 1253), *aff'd*, 347 F.3d 1208 (10th Cir. 2003); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1177 (10th Cir. 1999) (three month period, standing alone, fails to raise inference of retaliation); Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (same); Gioia, 194 F. Supp. 2d at 1218 (over three months between

protected activity and adverse action too long a time period, standing alone, to supply inference of causal connection); Guevera v. Best Western Stevens Inn, Inc., 78 Fed.Appx. 703, 705, 2003 WL 22407428 at *2 (10th Cir. N.M. Oct. 22, 2003) (five month gap between protected activity and adverse employment action too long to support inference of causation).

In this case, the alleged protected activity occurred in January, 2001, and the restructuring of the Charter's Ruidoso operation, leading to the elimination of Eggleston's position, occurred in May 2001 (Durrett Dep., p. 22, line 7-25; p. 23, line 1-17). Based on Tenth Circuit precedent, most likely, a four-month period of time, standing alone, would not support an inference of causation sufficient to satisfy the third prong of Plaintiff's *prima facie* case.

However, even giving Eggleston the benefit of the doubt as to the three prongs of his *prima facie* case of retaliation, the Court concludes that no genuine issue of material fact remains for a jury to decide with respect to the legitimate business reasons offered by Defendant for the elimination of Eggleston's position. In addition, Plaintiff fails to raise a genuine issue of material fact to demonstrate that Defendant's articulated reasons were pretextual.

### B.    *Legitimate Non-Discriminatory Business Reason*

In this case, Charter offers the testimony of Ann Durrett in support of its position that the reduction in force was part of a non-discriminatory or non-retaliatory, neutral business decision.

> QUESTION:   And do you know how or why Leon was no longer employed with Charter?
>
> ANSWER:   Yes, I do. His position was eliminated.
>
> QUESTION:   How did that occur? Why did that occur?
>
> ANSWER:   It occurred as part of organizational restructuring within our New Mexico systems, and Alamogordo

>was our larger system. Ruidoso is 30 miles--less than 30 miles up the mountain. It's a smaller system.
>
>And after several discussions with Dan Ryan. . ., who was a Director of Operations for that area, we determined that it made--that it didn't make sense to have two separate operations going that were so close together.
>
>And we decided to consolidate the office function into the Alamogordo office because it would have less impact on a fewer number of employees. The Office Manager in Alamogordo was a female, older than Leon, who had longer tenure with the company than Leon did.
>
>And the--since we already had an office manager down there, we only needed one office manager. And Leon's position was eliminated along with several other office positions, customer service positions, in the Ruidoso office.
>
>We--I don't remember how many total positions. I think we eliminated four or five positions, including Leon's. He was the only salaried position that was eliminated. Plus three or four CSRs.
>
>We kept one CSR senior position in the Ruidoso office along with the one retention specialist position, which we cross-trained for the CSR functions which we hadn't previously done. And that took place in May 2001.

(Durrett Dep., p. 22, lines 4-25; p. 23, lines 1-17).

Charter further offered the testimony of Ms. Durrett concerning the decision to down-size the Ruidoso office.

>ANSWER: We--well, we had a meeting with--we had a meeting with all of the office personnel. And when I say "we" it was myself and Dan Ryan, R-Y-A-N, who was the Director of Operations for what we call the Rocky

7

> Mountain Group. And the New Mexico properties were part of the Rocky Mountain Group.
>
> Dan and I had a meeting with all the office employee initially to announce that we were going to be eliminating several positions in that office, and that we would be meeting with each of them individually to discuss the impact to them, individually.

QUESTION: Okay.

ANSWER: The first person that we met with was Leon. And we met with him first because, basically, we were going in order of seniority, and Leon was the most senior person. He was the only salaried person being eliminated. And because he was a salaried person, his severance package looked somewhat different from the hourly severance packages that were being offered.

> In addition, we wanted to give Leon the opportunity to stay as the CSR senior if--if he wanted to, which he indicated very strongly that he wasn't interested. We gave him the severance package. He thanked us and said it sounded great.
>
> And I also told him that he was eligible for rehire, that there would be other CSR positions opening up down in Alamogordo, and he was more than welcome to apply for those positions if he was interested in the drive down the mountain to get there. But I also indicated, you know, that those were hourly positions.
>
> I also encouraged him to go to the Charter web site and look at other open positions in the company for which he might--he might be interested in. I said, you know, we frequently have other office manager positions that come open around the company and other systems. But I said, you know, for you to accept one of those positions means you'd have to move.

(Durrett Dep., p. 28, lines 9-25; p. 29, lines 1-18; p. 30, line 1).

8

Ms. Durrett also presented documentary evidence in support of her testimony that the office downsizing discussions occurred well before Plaintiff's January 11 letter. Indeed, the discussions concerning downsizing commenced in the summer of 2000.

> QUESTION: What is that?
>
> ANSWER: It is a spread sheet that I prepared, indicating employees in Ruidoso who would be impacted by the layoff--it shows employees that were not being laid off but were part of the office group.
>
> QUESTION: Okay. And was a routine part of your business practice at the time to prepare documents such as Exhibit 3?
>
> ANSWER: Yes.
>
> QUESTION: And when did you prepare Exhibit 3?
>
> ANSWER: Prior to the layoff March or April time frame.

(Durrett Dep., p. 35, lines 22-25; p. 36, lines 1-10).

> QUESTION: . . . [C]an you describe for the record, generally, when was the first--when were the first discussions internally about having any layoffs in connection with the Ruidoso or Alamogordo offices?
>
> ANSWER: The first discussions occurred as early as the previous August of 2000, during our budget talks. And the conversation went back to the need to become more organizationally efficient.
>
> And that having two small systems [Ruidoso and Alamogordo] so close together in New Mexico didn't make a lot of sense, that we were duplicating a lot of functions, and that, at some point, we needed to consolidate office functions.

9

> QUESTION:   When--so when was the decision made that consolidation of office functions would be a good idea?
>
> ANSWER:   The decision was finally made the following spring, March or April, when I was creating the spreadsheet in Exhibit 3.

(Durrett Dep., p. 35, lines 22-25; p. 36, lines 1-10, line 12-25; p. 37, lines 1-7).

Ms. Durrett testified that the downsizing decision occurred following discussions with Dan Ryan, his operation people, and with the regional Vice President of Operations, Rob Schweitz. (Durrett Dep., p. 37, lines 10-15). In explaining the business rationale, Ms. Durrett testified:

> ANSWER:   [A]fter a number of discussions, not just about New Mexico, but other locations within the national region, we began to consolidate functions in various locations, including here in New Mexico.
>
> We--focused in other areas first because they had bigger impact to budget. They were larger areas with more subscribers and were more important to the budget than New Mexico was.
>
> QUESTION:   And how did you make the decision to--for example, it sounds like you could have downsized at either Ruidoso or Alamogordo. How did you decide that it was going to be Ruidoso where most of the positions were going to be eliminated?
>
> ANSWER:   We looked at the size of the two operations. Alamogordo was the larger operation with more customers. Ruidoso was a smaller operation. They had fewer employees and fewer customers.
>
> We looked at overall--well for example, weather impact. Alamogordo is down in the valley, or on the desert floor, where Ruidoso is a mountainous area. It's impacted by bad whether in the winter time. It can be difficult to get to. Alamogordo is easier to get to.

10

> We--if--if we were to close the office functions in Alamogordo, we would have had at least double the number of employees who were impacted and had their positions eliminated, whereas in Ruidoso, the total number was only four or five people.

(Durrett Dep., p. 37, lines 16-25; p. 37, lines 1-23).

It is undisputed that in the downsizing process four or five positions in Ruidoso were eliminated, including Eggleston's. This fact weights heavily against Eggleston's assertion that Defendant's actions were taken in retaliation for Eggleston's opposition to alleged illegal employment practices. Moreover, Eggleston offers no evidence to raise a material issue of fact on this matter. Charter's explanations are sufficient to satisfy its burden of production that it had legitimate non-retaliatory business reasons for its decision to eliminate several positions, including that of Eggleston.

### C. *Sham or Pretextual Reason*

Notwithstanding a defendant's offer of a non-retaliatory explanation for the adverse employment action taken, a Title VII plaintiff may yet prove retaliation by presenting evidence that an employer's proffered reasons are not the true reasons for its actions, but rather are merely a pretext for retaliation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). Plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc.,108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted). A plaintiff can show that a defendant's proffered reasons are pretextual if, for example, he demonstrates that the reason is unworthy of belief, that a defendant acted contrary to written policy in taking its employment actions, that the employer acted contrary to its company practices. Martinez, 252 F. Supp. 2d at 1241.

11

However, the court may not second guess the business judgment of the employer. <u>Simms v. Oka. ex rel. Dept. of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1330 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999).  Moreover, the federal court does not sit as a super personnel board and review the business decisions of companies.  *See* <u>Cibas v. Lockwood</u>, 1994 WL 924145 at *3 (D.N.M. 1994); <u>Krause v. Bobcat Co.</u>, 297 F. Supp. 2d 1212, 1217 (D.N.D. 2003).

In this cases, Eggleston offers no evidence that the closure of the Ruidoso office was pretextual.  Indeed, the evidence is to the contrary.  Prior to Eggleston writing his January 11, 2001 letter or meeting with Charter's representatives concerning his own complaints of pay disparity, salary disparities for female CSRs, or his first mention of the likelihood of unionization, Charter had already been discussing ways of promoting office efficiency, reducing costs and significantly reducing the size of the Ruidoso office.

Moreover, Eggleston offers no evidence whatsoever to support a claim that the business decision was a sham or a mere pretext to hide its retaliatory motive.  It is undisputed that several other employees lost their jobs during this reorganization, and the resulting Office Manager position in Alamogordo was kept by a female manager who was senior to Eggleston.

Eggleston argues that there are factual disputes concerning whether he was offered a job as a CSR in Ruidoso or not, and whether his proposed severance agreement was different than the agreement provided all other employees. Charter responds that the severance agreement was, indeed, different because unlike the other positions that were eliminated in the Ruidoso office, Eggleston's was the only salaried position being eliminated.  Disputes of fact concerning whether he was or was not offered a replacement position are not necessarily material to the issue of whether there was retaliation or even to the narrower question here of whether Eggleston can show pretext.

12

Based on the evidence presented by Charter and the lack of evidence showing that Charter's reasons for its business decisions were pretextual or unworthy of belief, the Court concludes that there is no genuine issue of material fact for the jury to decide regarding the retaliation claim.

## II.     WRONGFUL/RETALIATORY DISCHARGE

Eggleston brings a virtually identical claim under New Mexico common law, claiming that his position was terminated in violation of public policy, including policies that encourage employees to organize collectively. Eggleston admitted in his deposition that the same allegations supporting his retaliation claim also support his wrongful discharge claim. [Eggleston Dep. at 151, 152.]

New Mexico courts have recognized an exception to the general rule of at-will employment when an employee is discharged in retaliation for engaging in an act favored by public policy. Lihosit v. I & W, Inc., 121 N.M. 455, 457 (Ct. App.), *cert. denied*, 121 N.M. 444 (1996). To establish retaliatory discharge, the employee must show a causal connection between his actions and discharge by a preponderance of evidence. Shovelin v. Central New Mexico Elec. Co-op., Inc., 115 N.M. 293, 303 (1993). While the Shovelin Court did not decide whether the burden-shifting procedure discussed above in reference to the retaliation claim would apply in all cases to a claim of retaliatory discharge, it recognized that some jurisdictions did utilize the burden shifting analysis. Id. at 303, n. 8. Thus, in those jurisdictions, plaintiff must satisfy his *prima facie* case, and ultimately demonstrate pretext if the defendant articulates a legitimate reason for the discharge. Id.

The Court again concludes for reasons similar to those stated above that Eggleston fails to raise a genuine issue of material fact that his views and statements to management regarding potential union activity and/or his complaints regarding inappropriate and boorish comments resulted in the elimination of his position. In other words, there is little, if any evidence of causal connection. In

13

addition, under the burden-shifting framework, Eggleston has not provided any evidence that Charter's articulated reasons for the elimination of his position were pretextual or unworthy of belief. Therefore, the claim of retaliatory/wrongful discharge cannot survive summary judgment.

## **Conclusion**

For the reasons stated above, the Court determines that Plaintiff failed to raise a genuine issue of material fact with respect to either of his claims of retaliation or retaliatory/wrongful discharge.

IT IS THEREFORE ORDERED that Defendant's Summary Judgment Motion [Doc. 23] is GRANTED and that Plaintiff's Complaint is dismissed, in its entirety, with prejudice.

*/s/ Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge